FILED
2021 Dec-07  PM 01:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| HARRY GARBER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  5:21-cv-00546-HNJ |
| | ) | |
| NATIONWIDE MUTUAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This diversity action proceeds before the court on Defendant's Motion for Judgment on the Pleadings.  (Doc. 25).  Plaintiff, Harry Garber, asserts state law causes of action for breach of contract, normal bad faith, abnormal bad faith, fraudulent misrepresentation, fraudulent suppression, and deceit against Defendant, Nationwide Mutual Insurance Company (Nationwide).  All causes of action arise from Nationwide's denial of Garber's claim under a trip cancellation policy.  As discussed, the pleadings present triable issues of material fact as to Garber's breach of contract and bad faith causes of action, but not as to his fraudulent misrepresentation, fraudulent suppression, and deceit causes of action. Therefore, the court will **PARTIALLY GRANT** Defendant's motion for judgment on the pleadings.

## STANDARD OF REVIEW

A party may move for judgment on the pleadings only after the pleadings have

closed. *See* Fed. R. Civ. P. 12(c).  Under the typical scenario, "[j]udgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 965 (11th Cir. 2014) (internal citation omitted).  In determining whether a defendant is entitled to judgment on the pleadings, courts must "accept all the facts in the complaint as true and view them in the light most favorable to the non-moving party." *Id.*  If comparison of the averments in the pleadings reveals a material dispute of fact, the court must deny judgment on the pleadings.  *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

Rule 12(c) also may serve as a vehicle for asserting a Rule 12(b) motion to dismiss after pleadings have closed.  *See Jiles v. United Parcel Serv., Inc.*, No. 308CV01192J25MCR, 2010 WL 11519465, at *2 (M.D. Fla. May 12, 2010), *aff'd*, 413 F. App'x 173 (11th Cir. 2011) ("Rule 12(c) is also a vehicle by which litigants may, after the pleadings are closed, assert a 12(b)(6) motion for their opponent's failure to state a claim upon which relief can be granted.") (citation omitted); *Gold v. Markham*, No. 98-7036-CIV, 1998 WL 1118629, at *1 (S.D. Fla. Dec. 2, 1998) ("Although Markam styles his motion as one for judgment on the pleadings, the crux of his arguments is that the Tax Injunction Act, 29 U.S.C. § 1341, and principles of comity bar federal subject matter jurisdiction over this controversy.  Therefore, the Court considers Markam's motion to be brought pursuant to Federal Rule of Civil Procedure 12(b)(1) rather than 12(c)."); 5C Charles

Alan Wright, Arthur R. Miller & May Kay Kane, Federal Practice and Procedure § 1367 (3d ed. 1995) (Rule 12(c) may serve "as an auxiliary device that enables a party to assert certain procedural defenses after the close of the pleadings").

## FACTUAL ALLEGATIONS OF PLAINTIFF'S COMPLAINT

Garber alleges he purchased trip cancellation insurance from Nationwide on September 4, 2020, for a premium of $462.58, to cover a beach house rental in Gulf Shores, Alabama, scheduled from October 9-13, 2020. Garber paid $7,107.22 in advance fees to reserve the property through TurnKey Vacation Rentals, Inc. (TurnKey). (Doc. 1, ¶¶ 7-9). TurnKey advised Garber

> that he had to cancel within 72 hours (3 days) of booking the reservation to be eligible to receive a refund; that there were no refunds for natural disasters; and Turnkey strongly encouraged Garber to purchase trip cancelation insurance and directed him to a link where he could purchase trip cancellation insurance through Nationwide.

(*Id.* ¶ 8).

As stated, Garber purchased the recommended insurance policy on September 4, 2021. (*Id.* ¶ 9). The applicable policy provisions stated:

> TRIP CANCELLATION
>
> The Company will reimburse You, up to the Maximum Benefit shown on the Confirmation of Coverage, if You are prevented from taking Your Trip for any of the following reasons that are Unforeseen and takes place after the Effective Date:
>
> . . . .
>
> Natural disaster at the site of Your destination that renders Your destination accommodations Uninhabitable;

3

. . . .

Mandatory evacuation (or public official evacuation advisements where there is no mandatory evacuation) issued by local government authorities at Your Trip destination due to hurricane or other natural disaster.

(*Id.* ¶ 23 (italics and boldface emphasis omitted); *see also* Doc. 7, at 34-35).  The policy defined "Uninhabitable" as meaning:

(1) the building structure itself is unstable and there is a risk of collapse in whole or in part; (2) there is exterior or structural damage allowing elemental intrusion, such as rain, wind, hail or flood; (3) immediate safety hazards have yet to be cleared, such as debris on roofs or downed electrical lines; or (4) the building is without electricity or water and/or is not suitable for human occupancy in accordance with local authority guidelines.

(Doc. 7, at 27-28).[1]

On September 16, 2020, the home Garber rented sustained damage to its siding and exterior as a result of Hurricane Sally.   (Doc. 1, ¶¶ 14, 17).   On October 4, 2020, Garber observed the exterior damage, and on October 5, 2020, he asked TurnKey about

---

[1] Garber's Complaint did not quote the statement providing coverage for Uninhabitable accommodations, or the definition of "Uninhabitable."  However, Nationwide attached a copy of the entire policy to its Answer, and Garber does not dispute the applicable policy language.  (Doc. 7). Pursuant to Federal Rule of Civil Procedure 12(d), the court may review that attachment without converting the motion for judgment on the pleadings to a motion for summary judgment.  *See Yeager v. Ocwen Loan Servicing, LLC*, 237 F. Supp. 3d 1211, 1215 (M.D. Ala. 2017) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)) ("On a motion for judgment on the pleadings, the court may consider documents attached to the pleadings, such as those documents attached to the complaint and answer in this case."); *see also Perez v. Wells Fargo N.A.,* 774 F.3d 1329, 1340 n.12 (11th Cir. 2014) (citations omitted) ("[O]n a motion for judgment on the pleadings, documents that are not a part of the pleadings may be considered, as long as they are central to the claim at issue and their authenticity is undisputed.").

4

the availability of the home.  "TurnKey replied that the home looked good and would be accessible on the reservation dates of October 9-13, 2020."  (*Id.* ¶¶ 17-18).

Also on October 5, 2020, Hurricane Delta approached the Gulf Shores area.  The City of Gulf Shores declared a local state of emergency and "urged residents to take precautions to protect themselves and their property."  (*Id.* ¶ 19).  On October 6, 2020, Alabama Governor Kay Ivey declared a state of emergency in response to the threat of Hurricane Delta, and she issued a mandatory evacuation order taking effect at 7:00 a.m. on October 7, 2020.  (*Id.* ¶ 20).

On October 7, 2020, Garber cancelled his TurnKey reservation set to commence on October 9 due to the evacuation order.  TurnKey refused to issue Garber a refund because Garber did not cancel within 72 hours of completing the booking.  (*Id.* ¶¶ 8, 21).  Therefore, on October 7, 2020, Garber filed a claim with Nationwide under the trip cancellation policy.  (*Id.* ¶ 22).  At 4:00 p.m. on October 8, 2020, Governor Ivey rescinded the mandatory evacuation order, but a coastal flood warning and high surf advisory remained in effect.  (Doc. 1, ¶ 25).

On October 21, 2020, Nationwide denied Garber's claim.  The denial letter stated:

> "the plan does provide reimbursement if you are prevented from taking your trip due to a mandatory evacuation issued by local government authorities at your trip destination due to hurricane or other natural disaster; however, based on the information on file, the mandatory evacuation was lifted on October 8, 2020.  Your trip was not scheduled to begin until October 9, 2020, after the mandatory evacuation was lifted; therefore, the mandatory evacuation did not prevent you from taking your

trip.  Regrettably, your claim does not qualify for reimbursement based on this reason."

(*Id.* ¶ 26).

On October 21, 2020, Garber appealed the denial and stated:

I completely disagree with your denial for this claim.  Governor Ivey lifted the mandatory evacuation order appx. 24 hours before the start of our trip.  People make plans based on the best available information they have at the time.  A travel ban was issued for the Gulf Shores area 2 days prior to our trip due to hurricane Delta being out in the gulf. Hurricane Sally was also predicted to hit Louisiana and it ended up hitting the Gulf Shores area just a couple weeks prior to our Vacation.  That is exactly what insurance is for.  I really did not think that this would even be an issue and I am amazed how Nationwide is handling this, I thought you were a better company.  In addition to the travel ban from the governor I have attached pictures of the house 4 days before we were to arrive.  This damage you see from the missing siding was done from hurricane Sally.  There is no way water did not intrude in this house and cause mold.  I asked the rental company several times if the house was usable and got a response that it was.  It was not until I actually drove out to the house that I got the true story as you can see in the pictures.  I have property less than a mile from this house and every house in that area received water and mold damage.  I do not intend to let this drop and I will do everything I need to do to make sure Nationwide lives up to its end of this agreement.

(*Id.* ¶ 27).

Nationwide denied the appeal, stating:

We are in receipt of your appeal regarding the Trip Cancellation claim processed by our office.  A thorough review of your claim file and all supporting documentation has been completed.  At this time, we must uphold our initial claim determination.  According to the documentation . . . provided, your trip scheduled from October 9-13, 2020 was cancelled because of the mandatory evacuation ordered by Governor Kay Ivey as well as the damage done to the rental house. The policy purchased lists specific reasons under each coverage that you must meet in order to qualify for the related benefit.  The Trip Cancellation coverage of the

6

policy states: "The Company will reimburse You, up to the Maximum
Benefit shown on the Confirmation of Coverage, if You are prevented
from taking Your Trip for any of the following reasons that are
Unforeseen and takes place after the Effective Date:". The mandatory
evacuation order was lifted on October 8, 2020 and therefore did not
prevent you from taking your Trip. We also reached out to Turnkey
Vacation rentals who confirmed that there was siding that came off during
the hurricane, but the house was not made Uninhabitable as the policy
defines.

(*Id.* ¶ 28).

Garber submitted a second written appeal on November 9, 2020, stating:

In your discussions with Turnkey how was it determined that the
house was safe to occupy? Did they have a remediation company take
moisture samples of the walls to see if moisture had intruded from the
missing siding which would lead to mold growth? Who was the person
who made the determination the house was "safe" to occupy? As per my
previous email after inquiring to Turnkey about the condition of the house
one week before our trip there was no mention from Turnkey that there
was any damage to the house and you can clearly see from my pictures
there was substantial damage. Is the presence of mold in a house
considered inhabitable under your policy? A reasonable person would
believe there is water intrusion and mold from missing siding and 105
Mph wind and heavy rain. Please provide from Turnkey the letter of
certification from a hygienist that either the mold had been remediated or
that there was no presence of mold prior to our scheduled trip. I strongly
disagree with your determination on both issues you cite.

(*Id.* ¶ 29).

Nationwide denied Garber's second appeal on December 6, 2020. The denial

letter stated:

We are in receipt of your second appeal regarding the Trip
Cancellation claim processed by our office. As a result of your concerns,
we have conducted a full review of your claim. At this time, we must
uphold our initial claim determination. According to your second appeal,
there was missing siding from the rental house that you believe allowed

water to intrude and mold to occur. The policy purchased includes Trip Cancellation coverage if a natural disaster renders Your destination accommodations Uninhabitable. The response you provided from Turnkey Vacation Rentals dated September 28, 2020 states: "The home will be accessible on the dates of your reservation. An update or notification will be sent to you if your reservation is affected with the damages of the property. As I have checked, everything looks good." You also advised that you asked Turnkey Vacation Rentals if the house was usable several times and they advised that it was. Turnkey Vacation Rentals also confirmed with us that some siding came off of the house during the hurricane, but the house was not Uninhabitable. The house was walked through and incurred no damage inside. The house was available to use during the rental dates.

(*Id.* ¶ 30).

Garber filed this case on April 19, 2021. He asserts claims against Nationwide for breach of contract, normal bad faith, abnormal bad faith, fraudulent misrepresentation pursuant to Alabama Code § 6-5-101, fraudulent suppression of material facts pursuant to Alabama Code § 6-5-102, deceit pursuant to Alabama Code § 6-5-103, and deceit pursuant to Alabama Code § 6-5-104. (Doc. 1). For his breach of contract claim, he requests damages in the amount of $7,107.22 (the amount he paid for the rental) plus fees. (*Id.* ¶ 35). For his normal and abnormal bad faith claims, he requests $7,107.22 plus fees, unspecified emotional distress damages, and unspecified mental anguish damages. (*Id.* ¶¶ 44, 56-58). For each of his fraudulent misrepresentation, fraudulent suppression, and deceit claims, he requests reimbursement of premiums in the amount of $462.58, the total trip cost of $7,107.22, unspecified mental anguish damages, unspecified emotional distress damages, unspecified compensatory damages, and unspecified punitive damages. (*Id.* ¶¶ 74-75,

80(h)-(k), 81, 85-86, 92-93).

## DISCUSSION

Nationwide petitions the court to grant judgment on the pleadings for all of Garber's claims. As portrayed below, the pleadings present triable issues of material fact as to Garber's breach of contract and bad faith causes of action, but not as to his fraudulent misrepresentation, fraudulent suppression, and deceit causes of action. Thus, Nationwide warrants judgment on the fraud, deceit, and suppression causes of action, but not on the breach of contract and bad faith causes of action.

**I.    Nationwide Does Not Warrant Judgment on the Pleadings for Garber's Breach of Contract Claims, as Disputed Material Facts Will Inform Both Whether the Mandatory Evacuation Prevented Garber from Taking His Trip and Whether the Rental Property was "Uninhabitable"**

Garber's Complaint alleges Nationwide breached the insurance contract when it denied his claim and failed to provide benefits under the policy. (Doc. 1, ¶¶ 31-36). To state a viable breach of contract claim, Garber must allege: "(1) the existence of a valid contract binding the parties; (2) [his] performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011) (citation omitted). The parties do not dispute that they entered into a contract, that Garber satisfied his obligations under the contract, or that Garber suffered damages (the non-reimbursable cost of his vacation rental) from the denial of his insurance claim. Rather, the controversy centers upon whether Nationwide failed to perform its contractual obligations, and that determination

depends in part upon an interpretation of the policy terms.

Pursuant to Alabama statute, "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended or modified by any rider, endorsement or application which is a part of the policy." Ala. Code § 27-14-17(a).  "Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996) (citation omitted).  When an insurance policy's intention is clear and unambiguous, the court shall enforce it as written. *Sentinel Ins. Co. v. Alabama Mun. Ins. Corp.*, 188 So. 3d 640, 644 (Ala. 2015) (citation omitted).

Garber asserts Nationwide should have reimbursed him for the cost of his trip under both the policy provision allowing for trip cancellation pursuant to the issuance of a mandatory evacuation order, and the policy provision allowing for trip cancellation when a natural disaster renders the destination accommodations "Uninhabitable."  As discussed below, the pleadings do not warrant a judgment in Nationwide's favor for either theory of the breach of contact claim, as disputed material facts will inform both whether the mandatory evacuation prevented Garber from taking his trip, and whether the premises were "Uninhabitable" on the relevant dates.

**A.    The Contractual Term "Prevented" Manifests an Ambiguity, and the Factfinder Must Evaluate Extrinsic Evidence to Construe the Term**

"If the terms of an insurance policy are plain and unambiguous, the interpretation of the contract and its legal effect are questions of law." *Sentinel Ins. Co.*, 188 So. 3d at 644 (citing *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 697 (Ala. 2003)). Garber asserts an ambiguity manifests in construing the policy term "prevented," in the context of assessing whether the mandatory evacuation "prevented' him from taking the trip.[2]    "'In determining whether an ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous. . . . This means that the terms of an insurance policy should be given a rational and practical construction.'" *Porterfield v. Audubon Indem. Co.*, 856 So. 2d 789, 799 (Ala. 2002) (citations omitted). "The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308-09 (Ala. 1999) (citation omitted). "A term in a contract is ambiguous only if, *when given the context,* the term can reasonably be open to different interpretations by people of ordinary intelligence." *Once Upon a Time, LLC v. Chappelle Properties, LLC*, 209 So. 3d 1094, 1098 (Ala. 2016) (emphasis in original) (citing *Lambert v. Coregis Ins. Co.,* 950 So. 2d 1156, 1162 (Ala. 2006); *Safeway Insurance Co. of Alabama v. Herrera,* 912 So. 2d 1140 (Ala. 2005)).

---

[2] Nationwide contends Garber failed to argue that the term "prevented" was ambiguous. To the contrary, Garber cited *Certain Underwriters at Lloyd's, London v. Kirkland*, 60 So. 3d 98, 101 (Ala. 2011)

"The question whether a contract is ambiguous is for a court to decide." *Hall v. Envtl. Litig. Grp., P.C.*, 248 So. 3d 949, 958 (Ala. 2017) (citations and quotation marks omitted). In construing contractual language,

> the mere fact that a word or a phrase is not defined in a document does not mean that the word or phrase is inherently ambiguous. . . . In the absence of a definition, the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it.

*Id.* at 959 (citations, quotation marks, and internal alterations omitted). "On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity." *Once Upon a Time,* 209 So. 3d at 1097 (citations omitted).

As discussed, Nationwide claimed in its denial letters that the Governor's mandatory evacuation order did not "prevent" Garber from taking his trip because the Governor lifted the evacuation order before Garber's trip commenced. Thus, the meaning of the contractual term "prevented" materially affected the outcome of Garber's insurance claim. Moreover, the policy does not contain a specific definition of the term "prevented," and this court's research located no Alabama case law construing the term in the context of a trip cancellation policy.

---

for the proposition that the court should construe insurance policy ambiguities against the insurer, (Doc. 29 at 6), and then Garber reviewed varying, alleged reasonable interpretations of the term. (Doc. 29 at 6-10). Therefore, Garber clearly argued that the policy's term "prevented" was ambiguous, or that reasonable interpretations fall in his favor in contrast to Nationwide's construal of the term.

Nationwide interprets the term "prevented" as requiring Garber to portray that the mandatory evacuation order manifestly enjoined him from checking into the rental *on the first scheduled date of his trip*. (*See* Doc. 30, at 2 ("Plaintiff admits that when he was scheduled to check-in to his rental, no evacuation order was in effect.")).  Thus, according to Nationwide, the term "prevented" inherently includes a requirement that the "prevention" be assessed on the trip's scheduled commencement date. (*See id.* ("Plaintiff argues that Nationwide added 'on the day of the trip' but this requirement is already present because it is inherent in the requirement that the insured be prevented from *taking their trip*, which begins on the day of departure.")) (emphasis in original).  If its meaning controls, Nationwide justifiably denied Garber's claim because, on October 9, 2020, the scheduled commencement date of Garber's trip, the Governor had already lifted the evacuation order.

In contrast, Garber asserts the court should construe the term "prevented" more broadly, without any implicit time frame.  According to Garber, an evacuation order "prevents" an insured from taking a trip if it reasonably precluded travel shortly before the trip commenced. (*See* Doc. 29, at 11 ("As any reasonable person in Mr. Garber's position would understand the policy, the issuance of a mandatory evacuation order at your destination shortly before you are scheduled to arrive is sufficient to 'prevent' that individual from taking that trip.")).

The Merriam-Webster Dictionary assigns three possible meanings to the term "prevent":  (1) "to keep from happening or existing"; (2) "to hold or keep back:

HINDER, STOP — often used with from"; and (3) "to deprive of power or hope of acting or succeeding." *See prevent, Merriam-Webster Online Dictionary* https://www.merriam-webster.com/dictionary/prevent (last visited Dec. 7, 2021).[3] The first definition supports Nationwide's construction, but the second and third definitions support Garber's broader construction.

The mandatory evacuation order did not "keep" Garber's trip from "happening" or "existing" as he conceivably still could have taken the trip upon the lifting of the order.  Contrariwise, a reasonable person may determine that a mandatory evacuation order "holds" or "hinders" one from taking a trip.  And the lifting of the order – in the late afternoon before the trip was scheduled to commence – does not necessarily arrest the hindrance if one may reasonably conclude that reinstating the trip at that juncture would be burdensome, unwise, or perhaps even just disheartening.  Likewise, the mandatory evacuation order could have "deprived" Garber of the "hope of acting or succeeding" in taking the trip.  And one may reasonably conclude that the subsequent lifting of the order – again, late on the planned trip's eve – did not forestall the initial deprivation of hope as plans and expectations may have altered by that point.

Furthermore, construing the policy as whole buttresses the reasonableness of Garber's interpretation of the term "prevented." In particular, the policy listed the

---

[3] Garber also points to a treatise definition of the term "prevent" in the context of occupational disability policies (Doc. 29, at 7-8), but that definition bears little relevance to the term in the context of a trip cancellation policy.

14

following, covered "perils" as other circumstances that would "prevent" a person from taking a trip: if an insured's cat or dog dies within seven days prior to a trip's departure date; if a company who employed an insured for two continuous years laid her off within 30 days of a trip departure; or if an employer transfers an insured 250 miles or more from his former place of employment.  (Doc. 7 at 34, 35).  Pursuant to the first dictionary definition of "prevented" cited previously, none of these perils "keep" a putative trip from "happening" or "existing" because one may conceivably still take the trip.

However, these perils may reasonably "hold" or "hinder" an insured from taking a putative trip due to the burden or disheartening effects occasioned by the circumstances.  Likewise, the perils may reasonably "deprive" an insured of the "hope of acting or succeeding" in embarking on the trip.  Hence, interpreting the term "prevented" in the context of other perils listed in the policy presents reasonable, diverging constructions of the policy vis-à-vis the mandatory evacuation peril.  Indeed, applying Nationwide's interpretation of the term "prevented" depicts these events would not enjoin an insured from taking a trip, yet the policy covers them nonetheless.

And contrary to Nationwide's assertions, a cancelled, mandatory evacuation order may reasonably incur lasting, lingering effects in the same manner as the other afore-listed perils, particularly if a government authority lifts the order on the eve of scheduled travel that an insured has abandoned.  Again, reinstating the trip at that late juncture could be burdensome, unwise, or even just dispiriting.  An ordinary, reasonable

person may have already settled into a judgement that a trip would not be feasible under the circumstances, and it may be unreasonable to penalize such a person for disregarding such impressions.

Therefore, both parties present reasonable interpretations of the term "prevented," and thus, the term, as used in this context, manifests an ambiguity. *See United Gov't Sec. Officers of Am., Int'l Union Loc. 22 v. Tennessee Valley Auth.*, No. 5:16-CV-00271-MHH, 2020 WL 1285920, at *2 (N.D. Ala. Mar. 17, 2020) (quoting *Stewart v. KHD Deutz of America, Corp.*, 980 F.2d 698, 704 (11th Cir. 1993)) ("'That both [interpretations] are reasonable is sufficient to establish that the [provision] is ambiguous . . . .'") (alterations and ellipsis in original).

The court must next determine whether established rules of contract construction resolve the ambiguity. *See Ohio Cas. Ins. Co. v. Holcim (US)*, 744 F. Supp. 2d 1251, 1259-60 (S.D. Ala. 2010) ("[T]he proper analytical sequence under Alabama law is as follows: (a) determination of whether the contract is ambiguous; (b) if so, application of rules of construction to resolve the ambiguity; and (c) if the rules of construction do not resolve the ambiguity, then look to factual issues, which are generally for the jury."). However, no rules of construction that the court may employ resolves the proper meaning of the ambiguous term "prevented." For instance, the court cannot resolve the ambiguity by applying the plain meaning of the term because, as discussed, the term could possess two reasonable plain meanings. Moreover, the circumstances do not require the court to choose between "a valid construction and an

invalid construction," thereby requiring the court "to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms." *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000) (citing *Voyager Life Ins. Co. v. Whitson*, 703 So. 2d 944, 948 (Ala. 1997); *Sullivan, Long & Hagerty v. Southern Elec. Generating Co.,* 667 So. 2d 722, 725 (Ala. 1995)).  Similarly, there exists no irreconcilable inconsistency between the term "prevented" and any other term of the contract, thereby requiring the court to resolve the inconsistency in favor of the prior clause.  *McCollough,* 776 So. 2d at 746 (citing *City of Fairhope v. Town of Daphne,* 282 Ala. 51, 58, 208 So. 2d 917, 924 (1968); *Whitson,* 703 So.2d at 949).  And there exist no handwritten clauses that warrant priority over typed clauses.  *See McKinney Drilling Co. v. Collins Co.*, 517 F. Supp. 320, 324 (N.D. Ala. 1981) (citing *Bartlett & Company, Grain v. Merchants Co.*, 323 F.2d 501, 506 (5th Cir. 1963); *Industrial Machinery, Inc. v. Creative Displays*, 344 So. 2d 743, 749 (Ala. 1977); *Restatement of Contracts* § 236(e) (1932)), *aff'd*, 701 F.2d 132 (11th Cir. 1983).[4]

---

[4] The Alabama Supreme Court follows the general rule of *contra* proferentem:  when no other principles of contract construction resolve an ambiguity, the court should construe the ambiguous term against the drafter of the contract. *FabArc Steel Supply, Inc. v. Composite Const. Sys., Inc.*, 914 So. 2d 344, 357-58 (Ala. 2005) (citations omitted).  However, *contra proferentem* "is generally a rule of last resort that should be applied only when other rules of construction have been exhausted." *Id.* at 357 (citations and internal quotation marks omitted).  Moreover, a court should not apply *contra proferentem* when doing so would thwart the legitimate application of the other rules of construction. *Id.* at 358 (citations omitted).  The other rules the court must apply before resorting to *contra proferentem* include the overriding principle that the construction of the contract should reflect the parties' intent.  *See ADTRAV Corp. v. Duluth Travel, Inc.*, No. 2:14-CV-56-TMP, 2016 WL 4614842, at *18 (N.D. Ala. Sept. 6, 2016) (citing *BellSouth Mobility Co. v. Cellulink, Inc.*, 814 So. 2d 203, 216 (Ala. 2001); *FabArc*, 914 So. 2d at 358) ("The purpose of the rules of construction, and the first rule of construction itself, is that the court must construe a contract to express the intent of the parties.") (quotation marks omitted).  Thus, the court must await appropriate review by the factfinder at trial (or, if discovery

Therefore, applying the rules of construction does not resolve the ambiguity, and factual issues arise because "one must go beyond the four corners of the agreement" to examine "the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement . . . ." *FabArc Steel Supply, Inc. v. Composite Const. Sys., Inc.*, 914 So. 2d 344, 358 (Ala. 2005) (citations omitted).  And "[w]here factual issues arise, the resolution of the ambiguity becomes a task for the jury." *Id.* (citation omitted).

Extrinsic evidence may reasonably indicate the term "prevent" means that a mandatory evacuation at the destination could have hindered Garber from taking his trip on October 9, or deprived him of hope of completing the trip, even though the

---

warrants, summary judgment) to ascertain whether extrinsic evidence can resolve the ambiguous term. If it does not, then *contra proferentem* may apply.  *See Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins. Co.*, 347 So. 2d 95, 99 (Ala. 1977) (citing *U. S. F. & G. v. Elba Wood Products, Ala.*, 337 So. 2d 1305 (1976)) ("The ambiguities, therefore, must be interpreted against the party drawing the contract *if the circumstances surrounding the contract do not make the terms clear*.") (emphasis added); *FabArc,* 914 So. 2d at 359 (quoting *Western Sling & Cable Co. v. Hamilton,* 545 So. 2d 29, 32 (Ala. 1989)) ("[T]he rule of *contra proferentem* is essentially one of legal effect, of 'construction' rather than 'interpretation,' because it can scarcely be said to be designed to ascertain the intent of the parties."); *see also Equinor USA Onshore Properties Inc. v. Pine Res., LLC,* 917 F.3d 807, 818 n.4 (4th Cir. 2019) ("While ambiguous contracts are generally construed against their drafter, [t]he general rule of construing an ambiguous contract against the drafter does not mean automatically holding in favor of the other party. . . . Otherwise, extrinsic evidence would be irrelevant.") (alteration and ellipsis in original, citation omitted); *Brady v. Park*, 445 P.3d 395, 410 (Utah 2019) ("A determination of the parties' intent based on extrinsic evidence is a factual determination that should be made by the fact-finder.  In the rare case where the extrinsic evidence 'does not reveal the intent of the parties,' a district court should then, and only then, 'resolve the ambiguity against the drafter.'") (citations omitted); *James B. Nutter & Co. v. Est. of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018) ("When the language is ambiguous, it is construed against the drafter, if the circumstances surrounding its use . . . do not indicate the intended meaning of the language.") (ellipsis in original, citation and quotation marks omitted); *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 866 N.W.2d 679, 685 (Wis. 2015) ("When the terms of a contract are ambiguous, however, evidence extrinsic to the contract itself may be used to determine the parties' intent, and *any remaining ambiguities* will be construed against the drafter.") (emphasis added, footnote omitted).

evacuation order lifted on October 8.  Consequently, the court cannot enter judgment on the pleadings in Nationwide's favor on the breach of contract claim.  The court will permit the parties to proceed to discovery to develop the factual record regarding whether the mandatory evacuation did, in fact, prevent Garber from taking the trip.

### B. Disputed Material Facts Will Determine Whether the Rental Property was "Uninhabitable"

Nationwide also contends it "had no requirement to reimburse [Garber] under the natural disaster peril because the rental was not Uninhabitable."  (Doc. 26, at 7).  According to Nationwide, "the pleadings demonstrate that [Garber's] rental was *not* Uninhabitable," as Garber asserts Turnkey Vacation Rentals claimed he could inhabit the rental home during his rental dates.  (*Id.*).  However, Garber proffers the opposing contention that he could not inhabit the rental home based upon his personal observations of the home and other homes in the area, including his own property.

Unlike in the previous section, Nationwide's denial of this claim did not rest upon its construction of an ambiguous policy term.   The parties do not dispute the meaning of the term "Uninhabitable"; rather, they dispute whether the home actually was Uninhabitable, and Garber alleges Nationwide failed to conduct a proper investigation into the home's habitability.  Resolving that dispute will involve assessing disputed material facts, including the extent of the damage to the home and Nationwide's efforts to assess that damage.  Consequently, the court cannot grant judgment on the pleadings in Nationwide's favor.  The parties should proceed to

discovery to develop the factual record.

In summary, the court will deny Nationwide's motion for judgment on the pleadings on Garber's breach of contract claim.

## II. Nationwide Does Not Warrant Judgment on the Pleadings for Garber's Bad Faith Claim Based Upon His Alleged Inability to Travel Due to a Mandatory Evacuation Order or the "Uninhabitability" of the Rental Property

Garber's Complaint alleges Nationwide denied his insurance claim in bad faith. The Alabama Supreme Court recognizes the tort of bad faith failure to pay an insurance claim "where there is either '(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'" *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (quoting *Chavers v. National Sec. Fire & Cas. Co.,* 405 So. 2d 1, 7 (Ala. 1981)). Those two scenarios comprise a single tort with two slightly different methods of proof. *Brechbill,* 144 So. 3d at 257-58 ("[T]here is only *one* tort of bad-faith refusal to pay a claim, not two 'types' of bad faith or two separate torts.") (emphasis in original); *see also Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018) ("Under Alabama law, bad faith is a 'singular' tort with two different methods of proof — 'normal' bad faith, also known as bad faith refusal to pay, and 'abnormal' bad faith, also known as bad faith failure to investigate.").

This tort has four elements plus a conditional fifth element, as follows:

"(a) an insurance contract between the parties and a breach thereof by the defendant;

"(b) an intentional refusal to pay the insured's claim;

"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."

*Brechbill*, 144 So. 3d at 257 (quoting *National Sec. Fire & Cas. Co. v. Bowen,* 417 So. 2d 179, 183 (Ala. 1982)).

Courts refer to the first method of proof as "bad faith refusal to pay," "normal" bad faith, or "ordinary" bad faith. To succeed on a "normal" bad faith theory, a plaintiff must prove the first four elements the Alabama Supreme Court set forth in *Brechbill.* Courts refer to the second method of proof as "bad faith refusal to investigate," "abnormal" bad faith, or "extraordinary" bad faith. To succeed on that theory, a plaintiff must prove all five elements. *Brechbill,* 144 So. 3d at 258 (quoting *Grissett*, 732 So. 2d at 976) ("Thus, for the tort of bad-faith refusal to pay, '[r]equirements (a) through (d) represent the "normal" case. Requirement (e) represents the "abnormal" case.'"); *see also Cole*, 326 F. Supp. 3d at 1330-31.

21

"Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial." *Brechbill*, 144 So. 3d at 258. Thus, "[t]he existence of an insurer's lawful basis for denying a claim is *a sufficient condition* for defeating a claim that relies upon the fifth element of the insurer's intentional or reckless failure to investigate." *Brechbill*, 144 So. 3d at 258 (emphasis in original). An insurer who presents a "debatable reason" existing at the time it denied the claim can avoid bad faith liability even if the insured identifies some deficiencies in the insurer's investigatory process. *Id.* at 259 (citing *Weaver v. Allstate Insurance Co.*, 574 So. 2d 771, 775 (Ala. 1990) (in turn quoting *State Farm Fire & Cas. Co. v. Balmer*, 891 F.2d 874, 877 (11th Cir. 1990))); *see also Coleman v. Unum Grp. Corp.*, 207 F. Supp. 3d 1281, 1284 (S.D. Ala. 2016) ("The *Brechbill* decision makes clear that the conditional fifth element is a potential substitute for the fourth element, but not for the third element, which the plaintiff must prove in every case.").

> **A.  Nationwide Does Not Warrant Judgment on the Pleadings for Garber's Bad Faith Claim Based Upon His Alleged Inability to Travel Due to a Mandatory Evacuation Order, as Nationwide's Reliance Upon the Ambiguous Policy Term "Prevented" Cannot Serve as a Legitimate or Debatable Reason for Denying Garber's Trip Cancellation Claim**

Nationwide does not warrant a judgment on the pleadings for Garber's bad faith claim regarding the denial of benefits involving the mandatory evacuation order. Garber's Complaint plausibly alleges facts which, if accepted as true, support each

element of the bad faith claim.  Garber asserts separate claims for both normal and abnormal bad faith (Counts II and III).  For his normal bad faith cause of action, he asserts Nationwide "deliberately and/or intentionally wrongfully denied" his insurance claim, lacked a "reasonably legitimate or arguable reason for denying the claim," lacked a "debatable reason for denying the claim," and "had actual knowledge of the absence of any legitimate or arguable reason for denying the claim."  (Doc. 1, ¶¶ 40-43).  For his abnormal bad faith claim, he reasserts those same allegations, and he also alleges

> Nationwide intentionally and wrongfully and/or recklessly denied the claim without having a lawful basis to do so and/or intentionally and/or recklessly failed to investigate Garber's claim; recklessly failed to submit the claim to a cognitive evaluation or review; created its own debatable reason for denying Plaintiff's claim; or relied on an ambiguous portion of the policy as a lawful basis to deny the claim.

(Doc. 1, ¶¶ 49-54).

In particular, Garber's Complaint presents triable issues regarding whether Nationwide lacked a legitimate, arguable, or debatable reason for denying Garber's insurance claim.  Garber alleges Nationwide based its denial decision upon its construction of the ambiguous term "prevented," and the denial letters Garber quoted in his Complaint support that assertion.  Under Alabama case law, an insurer's reliance upon an ambiguous policy term cannot serve as a legitimate, arguable, or debatable reason for denying an insurance claim, as permitting such reliance would encourage insurers to draft ambiguous policies so as to escape bad faith liability:

> Alabama courts have repeatedly stressed that insurers may not rely on an ambiguous policy term to deny coverage. *See e.g., Blackburn v. Fid. &*

23

*Deposit Co.,* 667 So. 2d 661, 669 (Ala. 1995); *Employees' Benefit Ass'n v. Grissett,* 732 So. 2d 968, 976-77 (Ala. 1998).  The oft-cited reason for this rule is that "if an insurer's subjective interpretation of an insurance policy could create the fairly debatable reason needed to defend a bad faith claim, then insurers would be encouraged to write ambiguous insurance policies." *Blackburn,* 667 So. 2d at 669.

*Phillips v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., No. 6:12-CV-02757-LSC, 2013 WL 5974906, *7 (N.D. Ala. Oct. 30, 2013).

This principle applies to Garber's bad faith claim.  The Alabama Supreme Court has primarily addressed an insurer's reliance upon ambiguous policy terms in the context of *abnormal* bad faith.  In *Blackburn v. Fid. & Deposit Co. of Maryland*, 667 So. 2d 661 (Ala. 1995), the Court addressed whether the insurer "failed to properly investigate [the insured's] claim for a defense to the *Roussel* buy-out lawsuits and failed to subject the results of that investigation to a fair review, resulting in a bad faith failure to defend," or in other words, an abnormal bad faith claim. *Id.* at 668.  Relying upon a decision from the Supreme Court of Arizona, the Alabama Supreme Court held that "an insurer's subjective belief that a portion of its insurance contract precludes coverage is not an absolute defense to a bad faith claim." *Id.* at 669 (citing *Sparks v. Republic Nat'l Life Ins. Co.,* 132 Ariz. 529, 647 P. 2d 1127 (1982), *cert. denied.,* 459 U.S. 1070, 103 S. Ct. 490, 74 L. Ed. 2d 632 (1982)).  The Alabama Supreme Court reasoned:

> "If the insurer's interpretation of its own contract as excluding coverage could render an insured's claim 'fairly debatable,' then insurers would be encouraged to write ambiguous insurance contracts, secure in the knowledge that an obscure portion of the policy would provide an absolute defense to a claim of bad faith."

*Blackburn*, 667 So. 2d at 669 (quoting *Sparks,* 132 Ariz. at 539, 647 P. 2d at 1137).

In *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340 (Ala. 2006), the Alabama

Supreme Court explicitly stated that,

> in an "*abnormal* [bad faith]" case, [an insurer] cannot use ambiguity in the contract as a basis for claiming a legitimate or arguable reason for not paying the claim.   Otherwise, an insurance company would have the incentive to write an ambiguous policy in order to create a defense to a bad-faith claim.

*Id.* at 349 (emphasis added).   *White* relied upon the Alabama Supreme Court's previous

decision in *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293 (Ala. 1999), which declared:

> To this date, the abnormal cases have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) *relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.*

*Id.* at 306-07 (emphasis added).

Multiple other decisions have recited the quoted language from *Slade*, thereby

assessing ambiguous policy terms in the context of abnormal bad faith claims.   *See, e.g.,*

*Dawson,* 2021 WL 3568620, at *8; *Houser v. Allstate Ins. Co.*, No. 2:20-CV-01661-ACA,

2021 WL 824988, at *3 (N.D. Ala. Mar. 4, 2021), *clarified on denial of reconsideration*, No.

2:20-CV-01661-ACA, 2021 WL 2193582 (N.D. Ala. Apr. 28, 2021); *Lord v. Allstate Ins.*

*Co.,* 47 F. Supp. 3d 1288, 1299 (N.D. Ala. 2014); *Phillips,* 2013 WL 5974906, at *6; *Nat'l*

*Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 129-30 (Ala. 2002).   The foregoing decisions

provide that an insurer's interpretation of an ambiguous term in an insurance policy

cannot serve as a reasonably legitimate, arguable, or debatable reason for a claim denial, at least for abnormal bad faith claims.

Contrastingly, the applicability of this principle to normal bad faith claims does not manifest as clearly.  In *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968 (Ala. 1998), the Alabama Supreme Court extended *Blackburn* to normal bad faith claims, holding: "in a 'normal' [bad faith] case, the insurer cannot use ambiguity in the contract as a basis for claiming a debatable reason not to pay the claim.  Otherwise, an insurer would have the incentive to write ambiguous polices in order to create an absolute defense to a bad-faith claim."  *Id.* at 976-77 (citing *Blackburn,* 667 So. 2d at 669); *see also United Servs. Auto. Ass'n v. Hobbs*, 858 So. 2d 966, 974 (Ala. Civ. App. 2003) ("In a 'normal' case the insurer is precluded from using an ambiguity in the contract as a basis for claiming a debatable reason not to pay a claim.") (citing *Grissett*, 732 So. 2d at 976).  As one decision has discerned, this principle from *Grissett* appears to be an outlier.  *See Wilson v. Cent. United Life Ins. Co.*, No. 6:09-CV-1343-TMP, 2011 WL 13285996, *10-11 (N.D. Ala. Aug. 19, 2011) (observing that in *Grissett,* the Alabama Supreme Court "seemed to say that the use of an ambiguous contract provision to avoid payment is simply one form of a 'normal' bad faith claim," while "[t]he more recent cases [*Watson v. Life Insurance Co. of Alabama*, 74 So.3d 470 (Ala. Civ. App. 2011); *White*, 953 So. 2d at 349; and *Singleton v. State Farm Fire & Casualty Co.*, 928 So.2d 280, 283 (Ala. 2005)] seem to firmly place in the 'abnormal' camp a theory of bad faith grounded on the insurer's reliance on an ambiguous contract provision for its refusal to pay.").

26

The Alabama Supreme Court has not explicitly overturned or modified *Grissett,* and the later decisions may not have effected a reversal or modification.  However, the court need not resolve this issue at this juncture as the abnormal bad faith claim surely proceeds, and the normal bad faith and abnormal bad faith claims essentially comprise a single claim.  *See Brechbill,* 144 So. 3d at 257-58; *Cole*, 326 F. Supp. 3d at 1329. Therefore, the court will await further review of this issue upon the parties' opportunity to address it at the appropriate time.

In summary, because Nationwide's interpretation of the ambiguous policy term "prevented" cannot serve as a legitimate or debatable reason for denying Garber's trip cancellation claim, the court cannot grant judgment on the pleadings in Nationwide's favor on Garber's bad faith claim based upon his alleged inability to travel due to a mandatory evacuation order.

**B.**     **Nationwide Does Not Warrant Judgment on the Pleadings for Garber's Bad Faith Claim Based Upon the "Uninhabitability" of the Rental Property, as Factual Issues Remain Regarding Whether Nationwide Intentionally Failed to Determine the Existence of a Lawful Basis for Denying the Claim**

Pursuant to prior analysis, Garber's bad faith claim stemming from the rental home's habitability does not involve the construction of an ambiguous policy term. Nevertheless, Garber's Complaint presents a viable bad faith claim under this theory. As with the claim based upon the mandatory evacuation, Garber's Complaint plausibly alleges facts which, if accepted as true, support each element of the bad faith cause of action.

Regarding whether Garber plausibly alleged Nationwide's lack of a legitimate, debatable, or arguable reason for denying the insurance claim, Garber's Complaint recites his claims and appeals letters and Nationwide's denials.  Those allegations depict that Nationwide denied his insurance claim because Turnkey Vacation Rentals represented the rental home suffered no interior damage and did not become "Uninhabitable" pursuant to the policy terms.

Ordinarily, that allegation would present at least an arguable reason for denying the claim.  However, the Complaint also calls into question the reasonableness of Nationwide's proffered basis for denial.  In particular, Garber questions whether Nationwide adequately investigated how Turnkey determined the house's habitability, whether mold existed inside the house, and how the level of damage the house sustained compared to the level of damage to other houses in the area, particularly given Garber's assertion that the rental home lost its siding from two walls in the midst of Hurricane Sally.

Thus, the Complaint does not conclusively establish that Nationwide possessed a legitimate, arguable, or debatable reason for denying the claim; rather, it raises factual issues regarding whether Nationwide intentionally or recklessly failed to investigate Garber's claim before denying it.  Those issues require development through discovery; consequently, Garber's bad faith claim based upon the alleged "Uninhabitability" of the rental property will survive the motion for judgment on the pleadings.

The court recognizes the general rule that a bad faith claim will fail unless the plaintiff can demonstrate he should receive a directed verdict on the breach of contract claim. *See Progressive Specialty Ins. Co. v. Hall*, No. 2:14-CV-02047-JEO, 2016 WL 3876440, at *7 (N.D. Ala. June 20, 2016), *report and recommendation adopted sub nom. Progressive Specialty Ins. Co. v. Hall*, No. 2:14-CV-02047-RDP, 2016 WL 3854232 (N.D. Ala. July 15, 2016) (quoting *Nat. Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982)) ("For a plaintiff to make out a *prima facie* case of bad-faith refusal to pay in the 'normal' case, 'the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law.'").  However, an insured may prevail on an abnormal, bad-faith-failure-to-investigate claim, even in the absence of entitlement to a pre-verdict judgment on the breach of contract claim, when the insurer intentionally or recklessly failed to investigate an insured's claim. *See Brechbill*, 144 So. 3d at 259 ("[E]vidence for the insurer's denial was gathered *after* the denial was made . . . .") (emphasis in original).  If the evidence eventually demonstrates Nationwide possessed a legitimate, arguable, or debatable reason for denying Garber's claim *at the time of the denial decision*, Garber's bad faith claim will succumb to the "heavy burden" he bears of proving bad faith. *See Hall,* 2016 WL 3876440, at *6.  However, at this stage, factual issues remain regarding the viability of both the breach of contract and bad faith claims. *See Thomas v. Principal Fin. Grp.*, 566 So. 2d 735, 750 (Ala. 1990) ("If the 'directed verdict on the contract claim standard' were applied, Principal Mutual would be allowed to obtain a judgment as a

matter of law on the bad faith claim, even though a factual question was presented as to whether its claims examiners either intentionally or recklessly failed to subject the results of the investigation to a cognitive evaluation and review and, thereby intentionally failed to determine prior to denying the claim whether there was, in fact, a lawful basis for denial.").

In summary, because factual issues remain regarding whether Nationwide presented legitimate or debatable reasons for denying Garber's trip cancellation claim, the court cannot grant judgment on the pleadings in Nationwide's favor on Garber's bad faith claim based upon the "Uninhabitability" of the rental property.

## III.   Nationwide Warrants Judgment on the Pleadings for Garber's Claims of Fraudulent Misrepresentation and Deceit, as Those Claims Solely Present Nationwide's Alleged Failure to Honor Contractual Promises

Garber's Complaint asserts separate causes of action for "Fraud – Misrepresentation of Material Facts, § 6-5-101, Code of Alabama 1975" (Count IV);[5] "Deceit, § 6-5-103, Code of Alabama (1975)" (Count VI);[6] and "Deceit – Fraudulent

---

[5] Section 6-5-101 states:  "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."  Ala. Code § 6-5-101.

[6] Section 6-5-103 states:

> Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood.

Deceit, § 6-5-104, Code of Alabama (1975)" (Count VII).[7] (Doc. 1).

To recover on a claim of fraudulent misrepresentation, *see* § 6-5-101, Ala. Code 1975, a plaintiff must establish four elements: "(1) a false representation; (2) of a material existing fact; (3) reasonably relied upon by the plaintiff; and (4) who suffered damage as a proximate consequence of the misrepresentation." *Southland Bank v. A&A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1210 (Ala. 2008) (citing *Ex parte Michelin North America, Inc.*, 795 So. 2d 674, 678 (Ala. 2001)).

A claim for deceit

> is extremely similar to [a misrepresentation claim], except that "a[n] action for deceit, under . . . § 6-5-103 and § 6-5-104, results from either a willful or reckless misrepresentation or a suppression of material facts with an

---

Ala. Code § 6-5-103.

[7] Section 6-5-104 sates:

> (a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.

> (b) A deceit within the meaning of this section is either:

>> (1) The suggestion as a fact of that which is not true by one who does not believe it to be true;

>> (2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

>> (3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or

>> (4) A promise made without any intention of performing it.

Ala. Code § 6-5-104.

> intent to mislead," *Whitlow v. Bruno's Inc.,* 567 So. 2d 1235,
> 1241 (Ala. 1990), while an action for misrepresentation of
> material fact can be based on an unintentional
> misrepresentation. [§ 6-5-101].

> *Montgomery Rubber & Gasket Co. v. Belmont Machinery Co.,* 308 F. Supp. 2d
> 1293, 1299 (M.D. Ala. 2004).

*Fratelli Cosulich Unipessoal, S.A. v. Specialty Fuels Bunkering, LLC*, No. CIV.A. 13-00545-KD-C, 2015 WL 4038979, at *12 (S.D. Ala. July 2, 2015) (alterations and ellipsis in original).[8]

In Alabama, "[a] mere breach of a contractual provision is not sufficient to support a charge of fraud.*" Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1370-71 (11th Cir. 1983) (citing *McAdory v. Jones,* 260 Ala. 547, 71 So.2d 526, 528 (Ala. 1954).  Rather, "failure to fulfill promises does not give rise to actionable fraud unless it is alleged and proved that the representations were made with intent to deceive and with no intent at the time the representations were made to carry them out." *Brown-Marx Assocs.*, 703 F.2d at 1370 (citing *Evans v. Adam's Rib, Inc.,* 289 Ala. 377, 267 So. 2d 448, 450 (Ala. 1972); *Bracewell v. Bryan,* 57 Ala. App. 494, 329 So. 2d 552 (Ala. Civ. App. 1976)).  "Failure to perform a promise is not of itself adequate evidence of intent to support an action for fraud." *Id.* (citing *Evans,* 289 Ala. 377, 67 So. 2d at 450; *Bracewell,* 57 Ala. App. 494, 329 So. 2d 552).  Generally, "to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based

---

[8] A cause of action under § 6-5-104 can also address suppression, as discussed in the next section.

on representations independent from the promises in the contract and must

independently satisfy the elements of fraud." *Hunt Petroleum Corp. v. State*, 901 So. 2d 1,

10-11 (Ala. 2004) (Houston, J., concurring) (emphasis omitted).[9]

To support his causes of action for fraud and deceit, Garber alleges Turnkey

advised him to purchase travel insurance because he could not receive a refund from

---

[9] Justice Houston's concurrence does not bind this court regarding Alabama law, yet federal court decisions have heeded Justice Houston's admonition. *See Muncher v. NCR Corp.*, No. 2:16-CV-782-VEH, 2017 WL 2774805, at ** 16-17 (N.D. Ala. June 27, 2017) (extensively analyzing Justice Houston's concurrence and the Alabama case law preceding it, and remarking, "Justice Houston's approach is in line with long-settled Alabama law," and "several other Judges have also found Justice Houston's analysis to be sound."); *NTA Graphics S., Inc. v. Axiom Impressions, LLC,* 413 F. Supp. 3d 1164, 1178 (N.D. Ala. 2019); *Jimmy Moore Agency, Inc. v. Allstate Ins. Co.*, No. 2:17-CV-0693-JEO, 2019 WL 10754334, at *8 (N.D. Ala. June 18, 2019); *Am. Chemicals & Equip., Inc. v. Cont'l Cas. Co.*, No. 6:15-CV-00299-MHH, 2018 WL 4539464, at *5 (N.D. Ala. Sept. 21, 2018); *Killough v. Monkress*, No. 5:17-CV-00247-AKK, 2018 WL 3641859, at *5-6 (N.D. Ala. Aug. 1, 2018); *Norfolk S. Ry. Co. v. Boatright R.R. Prod., Inc.*, No. 2:17-CV-01787-AKK, 2018 WL 2299249, at *11 (N.D. Ala. May 21, 2018), *on reconsideration in part*, No. 2:17-CV-01787-AKK, 2019 WL 1199836 (N.D. Ala. Mar. 14, 2019).

To be clear, several cases adjudicate promissory fraud claims based upon the breach of a contract's promises (that is, the promise to perform certain obligations under a contract serves as the alleged misrepresentation), so long as a plaintiff satisfies the other elements of the claim. *See Heisz v. Galt Industries, Inc.*, 93 So. 3d 918, 925 (Ala. 2012); *Target Media Partners Operating Co., LLC v. Specialty Mktg. Corp.*, 177 So. 3d 843, 866-67 (Ala. 2013); *Purcell Co. v. Spriggs Enterprises, Inc.*, 431 So. 2d 515, 519 (Ala. 1983). To prevail on a promissory fraud claim, Plaintiffs must satisfy two additional elements in addition to the afore-cited factors: (5) proof that, at the time of the misrepresentation, the defendant possessed the intent not to perform the act promised; and (6) proof that Defendants possessed the intent to deceive. *See Robinson v. Sovran Acquisition Ltd. P'ship*, 70 So. 3d 390, 396 (Ala. Civ. App. 2011) (quoting *Coastal Concrete Co. v. Patterson*, 503 So. 2d 824, 826 (Ala. 1987)). On a promissory fraud claim, a plaintiff must establish the defendant possessed the requisite intent to deceive when it issued the promise, i.e., when it executes a contract. *Southland Bank v. A&A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1211 (Ala. 2008) (citing *Martin v. American Medical Int'l, Inc.*, 516 So. 2d 640 (Ala. 1987)). A plaintiff cannot satisfy its burden of proving intent to deceive merely on the basis that a defendant failed to keep its promise. *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1204 (11th Cir. 2003) (applying Alabama law). Yet, "[c]ircumstantial evidence can be used to establish an intent not to perform and an intent to deceive." *Target Media*, 177 So. 3d at 867. As discussed in subsequent pages of text, the pleadings reasonably indicate that Nationwide offered a policy designed to insure against travel perils, not that it intended to deceive Garber into purchasing a policy that it had no intent of honoring under any circumstances. Accordingly, the pleadings do not provide a basis for a viable claim of promissory fraud.

Turnkey more than 72 hours after booking.  (Doc. 1, ¶ 62).  Garber clicked the link

Turnkey provided, which directed him to a Nationwide website that rendered the

following, alleged misrepresentations regarding Travel Protection Insurance:

 a. Protect your vacation investment against unforeseen events like a
hurricane . . . .

 b. We provide trip cancellation and interruption coverage protecting
up to 100% of your trip costs for reasons like:  weather disruptions
. . . .

 c. Protection Brands has partnered with world class, respected
underwriters like Nationwide and Berkshire Hathaway to ensure
you have coverage you can count on.

 d. Standard coverage provides 100% reimbursement for over 30
events that could cause you to cancel or interrupt your travel plans.

 e. Stuff Happens – Prepare for the Unforeseen. . . .  One in six
travelers experience unforeseen circumstances such as an illness, a
storm, or other events that can result in a cancelled or delayed trip
and a loss of all or part of your vacation investment.  One of the
most common reasons people consider travel insurance is for the
peace of mind in knowing that your prepaid nonrefundable
investment is protected should your vacation get interrupted . . . or
should you have to cancel the trip altogether.

 f. Travel Insurance can help:  cover nonrefundable payments such as
vacation rental . . . .

 g. Reimburse expenses such as accommodations when travel is
delayed or interrupted due to weather, hurricanes, blizzards and
other natural disasters.

(*Id.* ¶ 63).

  Nationwide also allegedly provided Garber a link to a sample policy, which

mirrors the actual policy language as follows:

TRIP CANCELLATION – The Company will reimburse you, up to the Maximum Benefit shown on the confirmation of Coverage, If You are prevented from taking Your Trip for any of the following reasons that are Unforeseen and takes place after the Effective Date:

Mandatory evacuation (or public official evacuation advisements where there is no mandatory evacuation) issued by local government authorities at Your Trip destination due to hurricane or other natural disaster.

(*Id.* ¶ 64).[10]

The foregoing statements reasonably indicate that Nationwide offered a policy designed to insure against travel perils, not that it intended to deceive Garber into purchasing a policy that it had no intent of honoring under any circumstances. Indeed, the statements do not indicate Nationwide misrepresented its endeavor to provide trip cancellation insurance. *See Slade*, 747 So. 2d at 323 (holding that plaintiffs could not have relied on insurance agent's statements about quality of insurance policy because the "statements amounted to nothing more than mere 'puffery,' in light of [plaintiffs'] level of education and degree of sophistication"); *Mason v. Chrysler Corp.*, 653 So. 2d 951, 953-54 (Ala. 1995) ("This Court has held that statements of opinion amounting to "puffery" or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act and, therefore, will not support a fraud claim.") (citations omitted); *c.f., Am. Pioneer Life Ins. Co. v. Sherrard*,

---

[10] Garber also alleges he reasonably relied upon Nationwide's misrepresentations when he paid the premiums for the trip cancellation insurance, and he suffered damages as a result of the misrepresentations when Nationwide failed to pay his insurance claim. (Doc. 1, ¶¶ 66, 73-74, 83-85, 88-92).

477 So. 2d 287, 291 (Ala. 1985) (Statements by insurance company executive that new policy was "greatest thing he had ever seen," that it was company's "number one priority," and that it would "revolutionize the industry" were mere puffery and did not support claim of fraud.).  Garber does not allege any facts, other than Nationwide's ultimate non-payment of benefits, indicating that Nationwide lacked the intent to honor the policy at the time it rendered the above representations. *See Killough v. Monkress*, No. 5:17-CV-00247-AKK, 2018 WL 3641859, at *5-6 (N.D. Ala. Aug. 1, 2018) (dismissing fraud claim when plaintiff "failed to allege specific conduct, independent from [defendant's] purported . . . failure to perform its contractual obligations, to establish that [defendant] intended to deceive [plaintiff] at the time the agreement was made, or to show the existence of representations, other than [defendant's] contractual promises, capable of supporting an independent fraud claim").

Garber's other allegations amount to the assertion that Nationwide represented it would pay benefits under the trip cancellation policy, but that it eventually failed to do so.  As those allegations intertwine inextricably with Garber's breach of contract claim, they do not provide an actionable foundation for fraud.  *Compare Voss v. State Farm Mut. Auto. Ins. Co.*, No. 1:17-CV-01465-SGC, 2018 WL 4635747, at *8 (N.D. Ala. Sept. 27, 2018) (rejecting fraud claim that "inextricably linked to the promises made in the insurance contract"), *with NTA Graphics S., Inc. v. Axiom Impressions, LLC,* 413 F. Supp. 3d 1164, 1178-79 (N.D. Ala. 2019) (permitting a fraud claim to proceed when "the alleged conduct giving rise to [the] fraudulent inducement claims is independent

36

from the conduct underlying [the] breach of contract claim").

In summary, as Garber's fraudulent misrepresentation and deceit claims assert only Nationwide's alleged failure to honor contractual promises, Nationwide warrants judgment on the pleadings for those claims.

## IV. Nationwide Warrants Judgment on the Pleadings for Garber's Fraudulent Suppression Claim, as Nationwide Did Not Owe Garber a Duty to Disclose It Would Not Honor His Trip Cancellation Claim Under the Circumstances Presented, and that Claim Solely Presents Nationwide's Alleged Failure to Honor Contractual Promises

Garber asserts a cause of action for "Suppression of Material Facts, § 6-5-102, Code of Alabama 1975" (Count V). Ala. Code § 6-5-102 provides: "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." To state a viable claim for fraudulent suppression, Garber must allege that: (1) Nationwide possessed a duty to disclose an existing material fact; (2) Nationwide concealed or suppressed that material fact; (3) Nationwide's suppression induced him to act or refrain from acting; and (4) he suffered actual damage as a proximate result. *Brett/Robinson Gulf Corp. v. Phoenix on Bay II Owners Ass'n, Inc.*, – So. 3d – No. 1180945, 2021 WL 2677854, at *15-16 (Ala. June 30, 2021) (citing *Aliant Bank v. Four Star Invs., Inc.*, 244 So. 3d 896, 930 (Ala. 2017)). Garber's claim for deceit pursuant to Ala. Code § 6-5-104 also addresses suppression, as that statute encompasses "[t]he suppression of a fact by one who is bound to disclose it or

who gives information of other facts which are likely to mislead for want of communication of that fact."  Ala. Code § 6-5-104(b)(3).

Garber alleges Nationwide had an obligation to communicate truthful, material facts of coverage to him, arising from the "confidential relations of the parties or from the particular circumstances of this case."  (Doc. 1, ¶ 80(I).  In contravention of this alleged obligation, Nationwide allegedly "acted willfully to deceive, or recklessly without knowledge, when it did not disclose or communicate to Garber the material truth regarding coverage."  (*Id.* ¶ 80(II)).  In particular, Nationwide allegedly failed to disclose the following information:

    a.    That this travel protection insurance would not Protect his vacation investment against unforeseen events like a hurricane. . . .

    b.    That this travel protection coverage would not protect up to 100% of his trip costs for reasons like:  weather disruptions. . . .

    c.    That this travel protection insurance was not coverage that could be relied upon.

    d.    That this travel protection insurance does not provide 100% reimbursement for weather related events that could cause Garber to cancel or interrupt his travel plans.

    e.    That this travel protection insurance would not provide coverage for an unforeseen weather event like a hurricane.

    f.    That this travel protection insurance would not reimburse expenses such as accommodations when travel is delayed or interrupted due to weather or hurricanes.

    g.    That this travel protection insurance will not follow the terms and wording of the policy regarding a claim for reimbursement if a trip

is canceled due to an evacuations order issued due to weather conditions such as a hurricane.

(*Id.* ¶ 80(III)).

Even though Garber lodges the bare allegation that Nationwide owed him the duty to disclose the facts it allegedly omitted, the remainder of the alleged facts demonstrate Nationwide did not owe any duty supportive of a suppression claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Well-pleaded factual allegations supporting a viable claim for relief do not encompass mere "labels and conclusions," legal conclusions, conclusory statements, or formulaic recitations and threadbare recitals of the elements of a cause of action.).

"A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1192 (Ala. 2008) (citations omitted).  The following factors apply in assessing whether alleged circumstances create a duty of disclosure: "'(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.'" *Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala. 1999) (quoting *Owen*, 729 So. 2d at 842-43).

"When one party has superior knowledge of a fact that is unknown to the other party, and the lack of knowledge will induce the other party to act in a manner in which he otherwise might not act, the obligation to disclose is 'particularly compelling.'" *Flying J*, 12 So. 3d at 1192 (citations and internal quotation marks omitted).  However, superior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such information.  *Id.* (citations and internal quotation marks omitted).  "One may also recover for fraudulent concealment by showing active concealment of a material fact with an intent to deceive or mislead."  *Auburn's Gameday Ctr. at Magnolia Corner Owners Ass'n, Inc. v. Murray*, 138 So. 3d 317, 330 (Ala. Civ. App. 2013) (citations omitted).

Garber has not alleged a confidential relationship existed between him and Nationwide, that he requested any particular information that Nationwide failed to disclose, or that the customs of the trade required Nationwide to explain, at the time it issued the policy, how it would interpret all policy terms in all contexts.  Rather, he asserts

> the relative knowledge of the parties, the value of the particular fact and the plaintiff's opportunity to ascertain the facts all point to the existence of a duty to disclose both [Nationwide's] overly restrictive use of the term "prevent" and its decision to add a time limit limiting the peril only to [t]he day on which the trip was supposed to begin.

(Doc. 29 at 13).  However, the pleadings demonstrate Garber retained full access to the policy language; consequently, he possessed as much knowledge as Nationwide regarding the policy terms.  Thus, Garber does not plausibly allege that Nationwide sustained any duty to disclose, at the time he purchased the policy, the manner in which

it would eventually construe certain policy terms, particularly under circumstances which had not yet presented themselves.

Moreover, Garber's allegations of suppression merely mirror his claim for breach of contract. He alleges Nationwide wrongfully failed to inform him it would not honor the trip cancellation policy under the circumstances presented. For the same reasons warranting rejection of the fraudulent misrepresentation and deceit claims, a suppression claim that inextricably intertwines with a breach of contract claim cannot succeed.

In summary, Nationwide warrants judgment on the pleadings for Garber's fraudulent suppression claim because Nationwide did not owe Garber a duty to disclose the particular, alleged facts, and because the claim mirrors Garber's breach of contract cause of action.

## CONCLUSION AND ORDER

As portrayed herein, the pleadings present triable issues of material fact as to Garber's breach of contract and bad faith causes of action, but not as to his fraudulent misrepresentation, fraudulent suppression, and deceit causes of action. Therefore, the court **PARTIALLY GRANTS** Nationwide's motion for judgment on the pleadings. The court **DISMISSES** Garber's fraudulent causes of action for fraudulent misrepresentation, fraudulent suppression, and deceit (Counts IV, V, VI, and VII).

**DONE** and **ORDERED** this 7th day of December, 2021.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE